UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Samantha B., by and through
her Parents and next friends,
H.B. and S.B.

       v.                            Civil No. 1:08-cv-383-JL
                                        Opinion No. 2009 DNH 196

Hampstead School District

### OPINION AND ORDER

The parents of Samantha B., a child diagnosed with various learning, emotional, and physical disabilities,[1] challenge the New Hampshire Department of Education's decision rejecting their claim that Samantha's placement at the Hampstead Middle School ("HMS") was inappropriate and in violation of the Individuals with Disabilities Education Act ("IDEA").  See 20 U.S.C. § 1415(i)(2).  Samantha's parents do not challenge the appropriateness of her individualized education program ("IEP")[2],

---

[1]Samantha has been identified with a specific learning disability, see 34 C.F.R. § 300.8, as a result of being diagnosed with inter alia, a non-verbal learning disability with other health impairment and attention deficit hyperactivity disorder. Joint Stmt. of Facts ¶ 4.  She also has an adjustment disorder with depressed and anxious mood.  R. at 10.  According to her parents, Samantha has received a diagnosis of dyspraxia and cerebral palsy.  R. at 1560.

[2]An IEP is a written document detailing the student's present educational level, the short-term and long-term goals of

but rather whether the *public* school is an appropriate placement for their daughter.  Samantha's parents ask the court to reverse the decision and order the Hampstead School District to reimburse them for costs associated with Samantha's unilateral placement in a private school specializing in educating students with disabilities.

The court has jurisdiction over this appeal under 28 U.S.C. § 1331 (federal question) and 20 U.S.C. § 1415(i)(2)(A) (IDEA). After oral argument and a review of the evidence, the court grants judgment in favor of the District.  The record supports the Hearing Officer's conclusion that placement at HMS provided Samantha with a free appropriate public education (a "FAPE") and, as such, reimbursement is not authorized under the IDEA.[3]

---

the plan, the specific services to be offered, and a set of objective criteria for later evaluation.  <u>See</u> 20 U.S.C. § 1414(d)(1)(A); <u>Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.</u>, 518 F.3d 18, 23 (1st Cir. 2008).  Under the IDEA, the IEP must provide each disabled student with an educational program tailored to his or her individual needs, <u>see</u> <u>generally</u> 20 U.S.C. § 1400(d)(1)(A), and each student must be offered special education and related services "as are necessary to permit the child to benefit from the instruction."  <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 189 (1982)(quotations omitted); <u>see</u> <u>also</u> 20 U.S.C. § 1401(29).

[3]The court, in reaching this decision, is mindful of important interests at stake.  "[J]udges are parents too, and . . . can admire the determination with which [Samantha's parents] have pursued the best possible education for their . . . disabled daughter.  That is as it should be.  But determination must be tempered by an understanding that school districts, like

## I.   **APPLICABLE LEGAL STANDARD**

In New Hampshire, the parents of a disabled child who they believe has been denied a "free appropriate public education" can request an impartial due process hearing before the New Hampshire Department of Education.  See 20 U.S.C. § 1415(f)(1)(A); see also 20 U.S.C 1412(a)(1)(A) (entitlement to a FAPE). Following that hearing, the hearing officer must issue a final decision, accompanied by findings of fact.  See id. §§ 1415(h), (i)(1)(A).  If either the parents or the school district is dissatisfied with the hearing officer's decision, that party may seek judicial review in state or federal court.  See id. § 1415(i)(2)(A).  The court reviewing the decision must then make a bounded, independent ruling based on the preponderance of the evidence.  See Lessard, 518 F.3d at 24; see also 20 U.S.C. § 1415(i)(2)(C)(iii).

The court's role in reviewing the hearing officer's decision is "one of involved oversight."  See Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993) (quotations omitted).  The applicable standard is an intermediate one under which the court must exercise independent judgment, but, at the same time, "falls somewhere between the highly deferential clear-error standard and

---

parents and children, have legal rights with respect to special education."  Lessard, 518 F.3d at 30 (citation omitted).

the non-deferential de novo standard."[4]   See Lessard, 518 F.3d at 24.

> The required perscrutation must, at one and the same time, be thorough yet deferential, recognizing the expertise of the administrative agency, considering the agency's findings carefully and endeavoring to respond to the hearing officer's resolution of each material issue.  Jurists are not trained, practicing educators.  Thus, the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges from imposing their view of preferable educational methods upon the States.

Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990) (internal citations and punctuation omitted) (quoting Rowley, 458 U.S. at 207); see also Lt. T.B. v. Warwick Sch. Comm., 361 F.3d 80, 83-84 (1st Cir. 2004).  In essence, although a district court gives "due weight" to the administrative record, "[its] review is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities."  G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 945 (1st Cir. 1991) (quotations omitted).

The party challenging the hearing officer's decision bears the burden of proving that the decision is wrong.  Roland M., 910

---

[4]Purely legal questions arising under the IDEA are reviewed de novo.  See Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 9 (1st Cir. 2002).

F.2d at 991; see Schaffer v. Weast, 546 U.S. 49, 51 (2005).  To
carry that burden, the moving party must do more than simply
point to the existence of procedural irregularities.  See Roland
M., 910 F.2d at 994; see also Gonzalez v. P.R. Dep't of Educ.,
254 F.3d 350, 352 (1st Cir. 2001) (noting that a district court,
faced with conflicting expert testimony, may justifiably feel
"bound to affirm" the state agency's determination).


## II.  __BACKGROUND__

     The record reveals the following facts.[5]  Samantha was
identified with certain developmental and speech delays at age
two, and, at age three, began receiving services from the
Hampstead School District.  Samantha eventually was diagnosed
with "Non-Verbal Learning Disorder Syndrome and Adjustment
Disorder with depressed and anxious mood" (NVLD).  R. at 1004.
At times relevant to this case, she was identified in the school
district as "a student with disabilities in the areas of Specific
Learning Disability due to a diagnosis of [NVLD] and Other Health
Impairment due to a diagnosis of Attention Deficit Hyperactivity
Disorder combined type."  Joint Stmt. of Facts ¶ 4.  According to

---

     [5]Under the IDEA, the "court reviews the administrative
record, which may be supplemented by additional evidence from the
parties . . . ."  See Lt. T.B., 361 F.3d at 83.

her private psychologist, this specific learning disability impacts a child's academic and social/emotional development. Essentially, children with an NVLD struggle to comprehend nonverbal and visual cues around them, and as such "have difficulty mediating and executing nonverbal tasks such as mathematics, understanding higher order or abstract language, understanding others' facial expressions, tone of voice and body posture, [and] reading social cues and social pragmatics . . . ." R. at 1004.  Accordingly, many common academic tasks are difficult for a child with NVLD to process, and as they develop, social interactions become very difficult because they struggle to comprehend nonverbal social cues.  R. at 1005.  For example, children with NVLD may have difficulty understanding facial cues, sarcasm, or may not maintain appropriate personal space with others.  In Samantha's case, she may misperceive a friendly pat on the back as "hitting" or a loud voice or firm command as "yelling."  As such, her private psychologist stated that "[t]hese misinterpretations make Samantha feel constantly confused and defensive."  Id.[6]

_____

    [6]Indeed, the nature of Samantha's  disability makes proper resolution of this case a unique challenge for all concerned. Specifically, her private psychologist, among others, noted:  "We know that she is not a very accurate reporter of certain situations due to her disability.  Someone objective to inform the team [at HMS] of what is going on would be a big help in

While still in pre-school, Samantha was identified as learning disabled and assigned a full-time aide.  She continued to be assigned an aide, either exclusively for Samantha or as a "shared aide," for the rest of her education in the Hampstead School District.  Samantha attended Hampstead Central School from the first grade through fourth grade.  At the end of Samantha's fourth grade year, the staff at Hampstead Central School presented Samantha's parents with a proposed IEP which contemplated, inter alia, that Samantha would attend the fifth grade at Hampstead Middle School ("HMS").  At HMS, students with disabilities are enrolled in an "inclusion program" where they take the majority of their classes in a regular classroom setting with "non-disabled peers."  R. at 1327.[7]  They receive additional support in the classroom, and then leave the classroom for instruction in specific academic areas that are challenging to them.[8]

---

getting Samantha to better understand the realities of what is going on and how to better cope."  R. at 781.

[7]Even severely disabled students are placed in a regular classroom setting and are "included to the best of their ability."  Id.

[8]In Samantha's case, this meant that she took all of her classes in a mainstream setting, except for reading.  In her mainstream classes, she would receive instruction in the same curriculum as her peers, with modifications tailored to her disability.  R. at 1327-28.

On June 11, 2007, Samantha's parents sent the District a lengthy memorandum ("the June 11th memo") noting in detail their objections to the proposed IEP.  Samantha's parents expressed concern about her academic, physical, and social development.  They specifically voiced a concern that the IEP did not make a number of what they felt were necessary accommodations and that it contemplated a high level of support from Samantha's educational assistant.[9]  They stated:

> [W]e are very concerned that the school district can meet Samantha's significant needs.  We are concerned that in order for Samantha to receive the amount of specialized instruction she requires to make adequate progress, she will require a significant amount of one-to-one instruction which will remove her even more from the classroom.  We are also very concerned that Samantha has become over reliant on the educational assistant; . . . . Samantha is becoming more and more ostracized from her peers and is developing the perception that she is different.  Samantha's ability to make social connections is seriously compromised due to her diagnosis of Non Verbal Learning Disability; having an educational assistant further compromises her ability to have normal interactions with peers.  . . . [It] is her perception that all know she is incapable of doing work without the educational assistant's help.  Samantha wants desperately to be able to complete work on her own, but the IEP as written will simply foster more and more reliance on an educational assistant.
>
> With this in mind, we feel it is imperative for the school district to consider placing Samantha in a specialized day placement.  The smaller community of

---

[9]In her affidavit, Holly B. stated that the potential that Samantha would become too dependent on an educational aide had always been a concern.  R. at 1018.

children with less reliance on adult support will allow
her to have a more normalized educational experience.

R. at 447.  In the end, they requested that the District consider
placement at the Learning Skills Academy, a small private school
whose programs are crafted to meet the needs of students with
specific learning disabilities.[10]  Samantha's parents and the
school met again to further revise Samantha's IEP.  Samantha's
parents again refused to accept the IEP, contending that the
school did not adequately consider the concerns outlined in the
June 11th memo, and alerting the District that it had retained
legal counsel in the matter.  Samantha's parents filed a request
for a due process hearing, see generally 20 U.S.C. §§ 1415
(b)(6), (c)(2), (f), alleging that Samantha would not benefit
from a placement at the public middle school and requesting
placement at Learning Skills Academy.  The parties entered
mediation, see generally 20 U.S.C. § 1415 (e), and eventually

---

[10]R. at 106.  According to the Educational Director at
Learning Skills Academy, the school offers a language based
curriculum for grades four through twelve.  Class sizes are kept
small, with an average student to teacher ratio of 4:1.  The
school also provides counseling services, and speech, language,
and occupational therapy.  There are additional tutoring services
in academics and social pragmatics after school.  Id. at 1026-27.
The court notes these details as a matter of background only.  As
noted in Part III infra, although the District challenges whether
the Learning Skills Academy program is appropriate for Samantha,
the court need not decide this issue because it concludes that
placement at HMS provided Samantha with a FAPE.

signed a settlement agreement.  The District agreed, <u>inter alia</u>,[11] to supplement the IEP with additional services, and hire an educational consultant, Dr. Terese Pawletko, to help the HMS staff understand and accommodate Samantha's needs.[12]  The District also agreed to pay for five additional counseling sessions with Samantha's private psychologist.  In exchange, Samantha's parents agreed to accept Samantha's IEP (reflecting the agreed upon changes) without exception.  The IEP was modified to reflect the settlement, and Samantha's parents accepted the IEP on August 23, 2007.

---

[11]The IEP that emerged after this agreement provided for: (1) an educational assistant to support Samantha in her mainstream classroom, both on a 1:1 basis and to provide small group instruction, (2) five-45 minute "pull-out" instructional sessions in reading, (3) consultation between the school psychologist and Samantha's private psychologist, (4) five sessions of outside counseling subsidized by the District, (5) 15 sessions of consultation by an independent consultant, (6) two sessions per week of group speech therapy, (7) one session per week of group occupational therapy, (8) one session per week of individual occupational therapy, (9) one session per week for individual counseling, (10) two sessions per day for ten minutes for a 1:1 "check-in and check-out" meeting with an educational assistant.  <u>See</u> Joint Stmt. of Facts ¶¶ 6-7.

[12]R. at 2-3.  Dr. Pawletko's services included meeting with and training the staff, and providing as-needed consultation to: (1) assist with Samantha's transition to HMS, (2) reduce her dependence on an educational aide, and (3) increase her social skills while decreasing her anxiety.  She also was obligated to meet every six weeks with the staff and Samantha's parents to discuss Samantha's progress.

Samantha began her fifth grade school year at Hampstead Middle School. Although the record contains evidence of frequent communication between HMS employees and Samantha's parents, the parties paint conflicting pictures of Samantha's overall emotional and educational progress from her start at HMS to her enrollment at Learning Skills Academy four months later in January, 2008.

The Hearing Officer concluded, and the record supports, that there was credible evidence "that [Samantha's] education at the local public school had its difficulties."[13]  Decision at 9. Samantha often reported feeling "overwhelmed" and "anxious" by the workload and the multiple transitions from her various classes to her locker and back to class. R. at 781, 783. This, in turn, could manifest itself in Samantha using an inappropriate tone of voice with her educational aide, whose response, in turn, was perceived by Samantha as harsh or rude. R. at 781-82. This anxiety resulted in a number of difficulties, including frequent visits to the nurse's office for perceived somatic complaints,

---

[13]See generally R. at 781 (being overwhelmed by the pace of the school day). Even recognizing these difficulties, the court, while reviewing the record, was impressed by, to borrow an observation from Samantha's parents, "Samantha's courage and ability to persevere through difficult challenges," R. at 441, during her transition to middle school. See e.g., R. at 32 (first day of school), 132 (instrument), 266a, 1061-62 (academic and social progress).

conflicts with her aides,[14] unfounded accusations of

inappropriate touching or abuse by an aide or her mother, and

multiple complaints of feeling unduly "rushed" at school.[15]

Ultimately, Samantha's parents, after providing a doctors' note

to the school, removed her from HMS for a two week period in

October 2007 due to concerns about Samantha's feelings of extreme

anxiety.[16]   Samantha returned to school on November 1st, but, by

_____

   [14]R. at 782-83.  Although the August 2007 IEP called for a
1:1 aide, the district agreed to modify her IEP to a "shared'
aide, R. at 74-75, in response to concerns voiced by Samantha's
parents that the aides were unduly hovering and this was reducing
Samantha's independence and making her feel different in front of
her peers.  The court notes that whether Samantha correctly
perceived her aides as unduly "hovering" is called into question
by observations of others at the school.  R. at 766-67 (email
from the independent consultant to Samantha's parents dated
9/6/2007).

   [15]The record reveals, however, that in response to her
feelings of being overwhelmed or rushed, Samantha's team at HMS
suggested that she drop a "unified arts" class (such as gym or
art) and instead schedule an additional study hall in order to
"slow down" the pace of the day and give her an opportunity to
catch up on her lessons.  Samantha's parents objected, on the
belief that Samantha enjoyed her unified arts classes, and they
offered her the chance to feel successful at school.  Ultimately,
HMS kept the unified arts class in her schedule.

   This disagreement exemplifies a common theme in this case,
namely that the parties recognize a problem, yet disagree on the
most appropriate way to resolve the issue. Indeed, the core
issue in this case concerns not the sufficiency of the IEP or the
educational challenges presented by Samantha's disability, but
placement for Samantha.

   [16]R. at 1015. The District contends that Samantha's parents
never proved that the anxiety giving rise to her removal from

the IEP team meeting on December 6, 2007, Samantha's parents were strongly considering removing Samantha from HMS in January and enrolling her at Learning Skills Academy.[17]  Samantha's Parents informed the District of their intent to unilaterally place

---

school resulted from tension over school as opposed to home based or other sources of stress.  See Decision at 6.  The court does not, and need not, resolve this dispute as it is unnecessary to the disposition of this case.

[17]R. at 1024-25.  In her affidavit, Holly B. states that in a letter dated December 5th and at the IEP meeting on December 6th, her attorney informed the district that Samantha's parents "were considering" making a unilateral placement at Learning Skills Academy and holding the District responsible.  By letter dated December 20th and received December 21st, Samantha's parents informed the District simply that they were making a unilateral placement for Samantha at Learning Skills Academy.  R. at 1025, 246.

The District contends that Samantha's parents failed to give adequate notice of their intent to hold the District responsible for the costs of the Learning Skills Academy placement. Def.'s Decision Mem. 21; see generally, 20 U.S.C. § 1412(a)(10)(C)(iii)(I) (reimbursement may be denied or reduced if parents fail to provide notice either at the most recent IEP meeting or in writing 10 business days prior); Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2496-97 (2009).  It contends that formal notice was untimely and stated only that Samantha's Parents were making a unilateral placement, thus failing to inform the District that they would hold it responsible for costs. Def.'s Decision Mem. 21-23.  The Hearing Officer took evidence on this issue, but did not address it given his determination that HMS was the appropriate placement for Samantha.  The court likewise need not determine whether notice was adequate given the ultimate disposition of this case.  Cf. Forest Grove Sch. Dist., 129 S. Ct. at 2496  (decision whether to reduce reimbursement an equitable one at the discretion of the court when the court determines that school district has failed to provide a FAPE).

Samantha at Learning Skills Academy by letter dated December 20th, and she enrolled in that school on January 2, 2008.

Although her time at HMS had its difficulties, there were positive developments at HMS.  The Hearing Officer concluded that "[t]he reasonable view of the evidence is that while [Samantha] was having emotional/social issues in the mainstream public school, progress was being made."  Decision at 9.  Dr. Terese Pawletko, the independent consultant, noted after observing Samantha at HMS, that the staff appeared to be trying to balance Samantha's desire for independence with her need for support, stating that "[t]he balance appears to be working well."  R. at 126.[18]  Further, she observed that "[a]side from the math/state testing stress she appears to be fairly comfortable, participates in class, [and] uses recess at times to get extra math help (advocating for herself) . . . ."  R. at 129.  Similar observations of social and emotional progress were made by her speech pathologist, R. at 1067-72, her math teacher, R. at 1061-63, and school psychologist, R. at 266a, 1075-81.  For example, her math teacher observed that during the beginning of the school

---

[18]In her view, Samantha's shared aide did not "hover" inappropriately.  R. at 124, 1092.  This observation was shared by others at the school.  R. at 1062.  Samantha's parents' and private counselor's concerns, however, were based on Samantha's reports that the aide was hovering.

year, Samantha appeared visibly nervous, missed significant class time at the nurse's office, and was often unable to appropriately ask for assistance.  R. at 1061.  By December, however, "Samantha appeared much happier.  She stayed in class and raised her hand when she needed help. . . . Samantha's capacity to regulate her behaviors and anxiety in the classroom has improved over the course of the school year, and seemed considerably improved by December 2007."  R. at 1061.

The record reveals academic improvement as well.  Her math grade by mid-October was a D+, but improved to a B by December. Her math teacher attributed this to additional pre-teaching and review of math concepts, Samantha's attendance at voluntary recess help sessions, and overall increased comfort in the classroom setting.  R. at 1060-61.  In reading, although below grade level, she demonstrated improvement under two different methodologies.  R. at 1055.[19]   Standardized tests administered in the Fall of 2007 showed that Samantha was partially proficient in reading and proficient in math.[20]  R. at 273.

---

[19]Samantha's grades for the first trimester included one "A" grade and six grades ranging from a "B-" to a "B+".  R. at 270. This is noteworthy because, with the exception of reading, Samantha was receiving the same curriculum as her non-disabled peers.  R. at 1055, 1328.

[20]Although her scores improved over the prior fall, R. at 272-73, the court notes that comparison is difficult because the

Samantha's parents filed a request for a due process hearing, see 20 U.S.C § 1415(f), on March 27, 2008 seeking costs associated with Samantha's placement at Learning Skills Academy. After a hearing on May 14-15, 2008, the Hearing Officer ruled in favor of the District, concluding:

> While it is found proven by a preponderance of the evidence that [Samantha's] public school experience had significant disruptions, the evidence from the District proves that [Samantha] was making meaningful social/emotional progress in dealing with the typical problems that a coded middle school child would have. . . . The reasonable view of the evidence is that while [Samantha] was having emotional/social issues in the mainstream public school, progress was being made. No evidence presented compels the determination that there was no progress, either academically, socially, or emotionally. The evidence reasonably shows that the new private school is more academically appropriate . . . . but the law does not compel this opportunity under the facts presented. Parents are permitted to choose a better educational opportunity for their child, but not with public money under the special education law.

Decision at 9-10. Samantha's parents timely filed this appeal, see 20 U.S.C. 1415(i), contending that the Hearing Officer erred in: (1) concluding that reimbursement would be denied because HMS was an appropriate placement for Samantha and (2) applying an incorrect standard when he stated that they failed to demonstrate

---

test was administered differently in the Fall of 2006 and the Fall of 2007. R. at 140.

that Samantha "made no educational progress" at HMS.  Complaint

at ¶49.[21]

---

[21]The parties agree that the IEP developed for Samantha was appropriate.  P.'s Decision Mem. at 9, 10; Def.'s Decision Mem. at 5.  The District contends that whether that IEP was implemented has been waived by Samantha's parents because it was never properly raised before the Hearing Officer and is thus not before this court.  Parents seeking redress in federal court must first raise issues regarding their child's "educational situation" at the due process hearing.  See Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 25 (1st Cir. 2002).  In their written submissions to the Hearing Officer (and the complaint filed with this court), the issues identified were whether (1) HMS was an appropriate placement and (2) whether Samantha's parents are entitled to reimbursement.  See  P.'s Pre-hearing Conference Statement at 4; P's Post Hearing Submission at 6; Complaint at ¶ 49.  Although Samantha's parents' submissions mention their belief that the IEP was "not implemented as written," see P's Post Hearing Submission at 7, it is not at all clear that they intended that statement as a challenge to the sufficiency of the IEP or whether it is part and parcel of their inappropriate placement argument.  Id.; cf. Mr. G. v. Timberlane Reg'l Sch. Dist., No. 04-cv-188-PB, 2007 WL 54819, at *2 (D.N.H. Jan. 4, 2007) (failure to implement).  Further, none of their requested findings of fact or rulings of law address this specific issue.  See P's Post Hearing Submission at 21-23.

Samantha's parents' "implementation" argument before this court is similarly vague.  They state only that "[a]lthough the IEP is not at issue in this matter, it cannot be ignored that the School District failed to implement the IEP as written . . . ."  P.'s Decision Mem. at 10.  Rather, they contend that  "[w]hat is at issue is the placement at Hampstead Middle School."  Id. at 11.  Courts are not required to construct arguments for parties that make only vague or undeveloped passing references to those arguments.  See, e.g., Rafferty, 315 F.3d at 25 n.2 (citing Weber v. Cranston Sch. Comm., 212 F.3d 41, 53 (1st Cir. 2000)).  Accordingly, this court will consider any "implementation" arguments only as they pertain to the issue of whether HMS was an appropriate placement.

After consideration of the record and a hearing on the merits, the court grants judgment in favor of the District.[22] The Hearing Officer properly concluded that at HMS, Samantha was not denied a FAPE at HMS because she was making educational progress and receiving appropriate supports to address her emotional needs.

III. **ANALYSIS**

A. **Statutory scheme**

Congress enacted the IDEA as part of an "ambitious federal effort to promote the education of handicapped children." Rowley, 458 U.S. at 179; see also C.G. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (1st Cir. 2008). Its purpose is "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d). The IDEA created a

---

[22]The District also contends that if this court concludes that HMS was not an appropriate placement for Samantha, the Hearing Officer erred in concluding that Learning Skills Academy was an appropriate placement. Def.'s Decision Mem. at 19. The District also contends that reimbursement is unwarranted because Samantha's parents failed to give proper notice to the school. Id. at 21. As discussed infra, because the court concludes that the Hearing officer did not err in concluding that HMS was an appropriate placement, it need not reach the other issues raised by the District.

federal grant program to aid the states in educating disabled
children.  See generally 20 U.S.C. § 1412(a)(1)(A).  In order to
receive these funds, states must provide all disabled children
with an opportunity to receive a FAPE.  See Rowley, 458 U.S. at
181.  New Hampshire administers those funds through its
Department of Education and its local school districts.  See N.H.
Rev. Stat. Ann. § 186-C:3.

A school district meets its obligation to provide a FAPE
"as long as the program that it offers to a disabled student is
'reasonably calculated' to deliver 'educational benefits.'"  Five
Town, 513 F.3d at 284 (quoting Rowley, 458 U.S. at 207).

> [A] FAPE has been defined as one guaranteeing a
> reasonable probability of educational benefits with
> sufficient supportive services at public expense.
> . . . [C]ourts have concluded that a FAPE may not be
> the only appropriate choice, or the choice of certain
> selected experts, or the child's parents' first choice,
> or even the best choice.  . . . [A] FAPE is simply one
> which fulfills the minimum federal statutory
> requirements.

G.D., 930 F.2d at 948 (quotations, citations, and emphasis
omitted) (listing cases).  "The IDEA does not place school
systems under a compulsion to afford a disabled child an ideal or
an optimal education."  Five Town, 513 F.3d at 284.  The Act
"emphasizes an appropriate, rather than an ideal, education . . .
. Appropriateness and adequacy are terms of moderation. . . .
[Thus] the benefit conferred need not reach the highest

attainable level or even the level needed to maximize the child's potential." Lenn, 998 F.2d at 1086.  Stated differently, while disabled students are undoubtedly entitled to receive an appropriate education, the IDEA "does not imply that a disabled child is entitled to the maximum educational benefit possible." Lessard, 518 F.3d at 23.

Where a state fails to provide a FAPE in a timely manner, the parents of a disabled child have the right to seek reimbursement for private school tuition.  See Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985).  Reimbursement under the IDEA is "a matter of equitable relief committed to the sound discretion of the trial court."  Mr. I. v. Maine Sch. Admin. Dist. No. 55, 480 F.3d 1, 23 (1st Cir. 2007) (quotations omitted).  The Supreme Court has made clear, however, that parents who unilaterally change their child's placement without the consent of state or local school officials "do so at their own financial risk," see Burlington 471 U.S. at 374, and are entitled to reimbursement "only if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act."[23]  Florence County

---

[23] The IDEA provides:

(ii) **Reimbursement for private school placement.**  If the parents of a child with a disability, who

20

<u>Sch. Dist. Four v. Carter</u>, 510 U.S. 7, 15 (1993) (emphasis in original); <u>see also</u> <u>Rafferty</u>, 315 F.3d at 26.  If a school district has been "unable to furnish a disabled child with a FAPE through a public school placement," the school district "will be responsible for the reasonable costs incident to that private placement."  <u>Five Town</u>, 513 F.3d at 285.

"It is common ground that the IDEA manifests a preference for mainstreaming disabled children," <u>id.</u>; <u>see also</u> <u>Rowley</u>, 458 U.S. at 202, and "[t]o the maximum extent appropriate," disabled children should be offered a FAPE in the "[l]east restrictive environment."  20 U.S.C. § 1412(a)(5)(A); <u>see</u> <u>Five Town</u>, 513 F.3d

---

> previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C).  School districts that "want to avoid reimbursing parents for the private education of a disabled child can do one of two things:  give the child a [FAPE] in a public setting, or place the child in an appropriate private setting . . . ."  <u>Florence County</u>, 510 U.S. at 15.  "A private placement is proper if it (1) is appropriate, i.e., it provides significant learning and confers meaningful benefit, and (2) is provided in the least restrictive educational environment."  <u>Lauren W. v. DeFlaminis</u>, 480 F.3d 259, 276 (3d Cir. 2007) (internal citations omitted).

at 285.  In other words, disabled children should be "educated with children who are not disabled," and special classes or separate schooling should occur only when an appropriate education cannot be provided in "regular classes with the use of supplementary aids and services."  20 U.S.C. § 1412(a)(5)(A); but see Lamoine Sch. Comm. v. Ms. Z., 353 F. Supp. 2d 18, 31 (D. Me. 2005) ("an IEP can override this default in situations where the student would not receive an educational benefit at the local school").  Ultimately, "the goal [of the IDEA] is to find the least restrictive educational environment that will accommodate the child's legitimate needs."  Five Town, 513 F.3d at 285.

**B.   Placement challenge**

The court must determine whether, giving due weight to the Hearing Officer's findings, Samantha's placement at HMS was "reasonably calculated to enable the child to receive educational benefits."  G.D., 930 F.2d at 950 (quotations omitted).  As noted earlier, Samantha's parents, as part of a settlement agreement, accepted the 2007-2008 IEP in August 2007.  They do not challenge the adequacy of that IEP, but rather contend that Samantha's placement at HMS was inappropriate and not reasonably calculated to provide Samantha a FAPE, thus entitling them to reimbursement

for her education at Learning Skills Academy.[24]  Complaint at ¶¶

48-49.  The District contends that not only did Samantha receive

a FAPE at HMS, but that Learning Skills Academy would be an

inappropriate placement.[25]  The Hearing Officer found both

---

[24]Samantha's parents contend that the Hearing Officer placed
too high a burden on them when he stated that "[c]redible
evidence from the Parents, that Student was making <u>no</u> educational
progress was lacking."  Decision at 9.  This argument fails for
many reasons.  Foremost, Samantha's parents misconstrue the
nature of this statement in the context of the entire order.  <u>Cf.</u>
<u>Five Town</u>, 513 F.3d at 289 (court not swayed by arguments that
inaccurately state the record).  The Hearing Officer was making a
factual observation about the evidence presented.  As a matter of
law, however, the Hearing Officer later concluded:  "The evidence
from [the] Parents fails to meet the preponderance standard that
the Student was making insufficient educational progress such
that would justify an order for out of district placement."
Decision at 9.

A district "is required by the Act merely to ensure that the
child be placed in a program that provides <u>opportunity</u> for <u>some</u>
educational progress."  <u>Abrahamson v. Hershman</u>, 701 F.2d 223, 227
(1st Cir. 1983) (emphasis added).  Thus, the Hearing Officer, in
concluding that Samantha was making sufficient educational
progress at HMS, correctly applied the law, and put the ultimate
burden on Samantha's parents as the party seeking relief.  <u>See</u>
<u>Schaffer</u>, 546 U.S. at 62.  The court notes, however, that
academic progress "is not the only indicia of educational
benefit," rather, actual educational results, while relevant,
must be considered along with whether the district offers other
services required to address a student's special needs.  <u>Roland</u>
<u>M.</u>, 910 F.2d at 991-92; <u>see</u> Part III(B)(2) <u>infra</u>.

[25]More succinctly, the case presents the issue of whether the
HMS "inclusion" model or Learning Skills Academy's language-based
model is appropriate for Samantha.  In cases involving a choice
between two educational approaches, district courts have been
cautioned against capriciously overturning the decision of the
state administrative agency.  <u>Cf.</u> <u>Roland M.</u>, 910 F.2d at 992.
This is advised because "the alchemy of 'reasonable calculation'

schools to be appropriate, opining that Learning Skills Academy is better suited to educate Samantha.  The Hearing Officer ultimately ruled, however, that because the law guarantees only an adequate, not optimal education, reimbursement was not required.  Decision at 9-10.

The court must determine first, therefore, whether the Hearing Officer correctly concluded placement at HMS provides "a reasonable probability of educational benefits with sufficient supportive services. . . ."  G.D., 930 F.2d at 948, keeping in mind that "the language of the [IDEA] contains no requirement . . . that states maximize the potential of handicapped children . . . ."  Abrahamson, 701 F.2d at 227 (quotations omitted).

### 1.   **Educational benefit - academic progress**

Placement at HMS was reasonably calculated to confer educational benefits to Samantha as required under the IDEA.  See id. (education "must be sufficient to confer some educational benefit" (quotations omitted)).  This conclusion is based not only on the court's deference to the Hearing Officer's educational expertise, cf. Roland M., 910 F.2d at 992, but also

---

necessarily involves choices among educational policies and theories - choices which courts, relatively speaking, are poorly equipped to make."  Id.

on substantial evidence in the record of the wide array of services offered to Samantha coupled with the objective academic progress she made under the HMS IEP.  See Rowley, 458 U.S. at 203.[26]

Here, the record supports the District's argument, and the Hearing Officer's conclusion, that placement at HMS provided Samantha with a FAPE.  As noted earlier, Samantha earned better than passing grades in all subjects.  Further, with the exception of reading, she was taught the same curriculum as her non-disabled peers.  Cf. id. (FAPE requirement satisfied if program "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade").  Samantha demonstrated progress from a D+ grade to a B grade in math, a subject particularly challenging for her, after taking advantage of extra help opportunities in place at HMS.[27]  She earned a "proficient"

---

[26]In Rowley, the Supreme Court addressed whether a hearing-disabled student's proposed IEP was likely to provide her with the educational benefits necessary to satisfy the IDEA.  See id. at 202-205.  There, the Court focused on the student's academic achievement and grade-to-grade advancement in determining whether she would benefit from her IEP.  See id. at 203.  Noting that the student's IEP provided for various services specifically addressing her disability, see id. at 184, the court found that the student's demonstrative progress, when considered along with the school's proposed services, established that she had been provided with a FAPE.  See id. at 203 n.25.

[27]Samantha's parents argue that the Hearing Officer erred in concluding that Samantha was making progress in math.  They

score in math on state standardized testing, and one of

"partially proficient" in reading.[28]   Moreover, although she was

_____

contend that her fifth grade teacher's account of progress is not
credible given that Samantha, in tests administered at Learning
Skills Academy, performs below grade level in math.  Further,
they implied, without much more than allegation, that the math
teacher did not know Samantha or her learning style.  P.'s
Decision Mem. at 10-11.  We cannot conclude that the Hearing
Officer erred, however, because his finding of credibility
appeared to be in part based on that teacher's state
certification and receipt of various teaching awards, and the
Hearing Officer's recognition that progress was made by Samantha
after attending voluntary extra help sessions.  Decision at 7-8.
In this instance, where the Hearing Officer both took oral
testimony, R. at 1438-62, and reviewed the math teacher's
affidavit, R. at 1058-63, the court is not persuaded that the
Hearing Officer's credibility determination was unwarranted.  Cf.
Gonzalez, 254 F.3d at 351.

     Similarly, evidence in the record contradicts Samantha's
parents' assertion that the staff at HMS "did not seem to know"
Samantha "as a learner." P.'s Decision Mem. at 10.  First, the
staff received a detailed memorandum regarding Samantha's
disability from Dr. Pawletko, the independent consultant hired
pursuant to the District's settlement agreement with Samantha's
parents.  They also met with Dr. Pawletko to discuss Samantha's
needs.  R. at 51-60, 763.  In fact, just prior to the first day
of school, the consultant emailed Samantha's parents about her
impression that the staff was experienced with children like
Samantha, had reviewed the material, and listened to her
recommendations.  R. at 763.  Further, the court questions
whether the math teacher was unfamiliar with Samantha's issues
given that she made specific accommodations for Samantha, R. at
1440-41, 1446-47, and that Samantha was a regular attendee at the
teacher's voluntary extra help sessions at recess.  R. at 1445.

[28]HMS administered the standardized New England Common
Assessment Program test ("NECAP") which evaluates a child's
mastery of concepts that should be taught in the prior grade
level.  An employee for the District stated that possible scores
on that test are:  (1) below proficiency, (2) partially
proficient, (3) proficient, and (4) proficient with distinction.

not reading at grade level, there was evidence that she was progressing under two separate HMS reading programs.[29]  R. at 1055.  Further, Samantha's teachers and special education specialists echoed the conclusion that Samantha was making educational progress at HMS.[30]

The record thus supports the Hearing Officer's conclusion that despite difficulties in her transition to HMS, Samantha was making sufficient academic progress in the public school.  See Decision at 9-10.  Her placement at HMS did confer some academic benefit as required by the IDEA.

––––––––––––––––––––––

A "proficient" score means that a student has met New Hampshire state benchmarks for that grade.  R. at 1059-60.

[29]These were the "Reading Milestones" and "Dolch" reading programs.  R. at 1055.  The court's notation of these programs should not be construed as an endorsement, but only to identify the specific methodology used, as it is not the role of the court, nor within the court's expertise, to evaluate or endorse specific educational programs.  See, e.g., G.D., 930 F.2d at 945 (relying on Rowley, 458 U.S. at 206).

[30]Counsel for Samantha's parents, at oral argument, conceded that a FAPE can be demonstrated by a showing of some educational progress, and that Samantha did make some academic progress at HMS.  Counsel contended that even though academic progress was made, HMS was still an inappropriate placement for Samantha because of a lack of social and emotional progress at the school. As discussed infra Part (III)(B)(2), however, the court concludes that the Hearing Officer properly concluded that sufficient emotional progress was being made at HMS as well.

## 2.   **Educational benefit - emotional progress**

Given the nature of Samantha's non-verbal learning

disability, placement at HMS might not have been appropriate if

it did not foster social and emotional progress as well.  In

order to further the goals of the IDEA, the court of appeals has

held that "the IDEA entitles qualifying children to services that

target all of their special needs, whether they be academic,

physical, emotional or social."  Mr. I., 480 F.3d at 12

(quotations, emphasis and brackets omitted);[31]  Lenn, 998 F.2d at

1089-90 (although purely academic progress may be sufficient to

demonstrate educational benefit, judges need not make a series of

findings for each area, but must take special needs into

account).  The Hearing Officer concluded that Samantha "was

making meaningful social/emotional progress in dealing with the

typical problems that a coded middle school child would have."

Decision at 9.  The record strongly supports this conclusion.[32]

---

[31]The law does not mandate services addressing "problems
truly distinct from learning problems," id. (quotations omitted),
but rather issues that interfere with a child's ability to learn.
See id.  In this case, Samantha's emotional progress is clearly
integral to her academic development, and as such, it is
appropriate for both the Hearing Officer and this court to take
her emotional needs into account.  See id.

[32]There was conflicting evidence on this point provided by
Samantha's parents and her private psychologist.  See R. at 1010-
12; 1014-15; 1024.  However, [w]here the evidence permits two
plausible views . . ., the [state administrative] agency's choice

To be sure, there were "significant disruptions" in her social/emotional progress at the beginning of the school year. The record, however, supports a finding that Samantha was beginning to learn to process her anxiety using a variety of breathing techniques and structured exercises and to better "read" social interactions through role playing and social coaching.  R. at 266a, 1061-63; 1068-72; 1076-79; 1341.  Multiple staff members noted that by the end of the fall, Samantha was much happier and more capably interacting with her peers.  R. at 1061-63; see also R. at 1053-54; 1076-81; 1072.[33]  Her math teacher noted that Samantha's improvements in anxiety management and classroom behavior directly correlated to her academic progress.  R. at 1061-62.  By late fall, Samantha's comfort level

---

between them cannot lightly be disturbed."  Roland M., 910 F.2d at 994.  This is especially true where, as here, there is conflicting expert testimony regarding placement.  Lessard, 518 F.3d at 24; cf. Gonzalez, 254 F.3d at 352.  Moreover, in this case, the Hearing Officer was required to weigh the observations of witnesses at the school against those of witnesses relying on subjective reports by Samantha whose disability sometimes affects her perception of her environment.  See supra note 6; cf. Galina C. v. Shaker Reg'l Sch. Dist., No. 03-34-B, 2004 WL 626833, at *10 (D.N.H. March 30, 2004) (finding testimony of classroom observers valuable in determining educational benefit).

[33]For example, her speech pathologist noted that she was "an engaging student with peers she enjoyed."  R. at 1072.  Her math teacher described her as "liked and accepted" and that she "generally enjoys interacting with her non-disabled peers, [and] is improving in her skills to do so."  R. at 1063.

at HMS improved to where she ran for school student council and auditioned for and performed in the school play.  R. at 1375-76.[34]

Under this standard, and on this record, the court cannot conclude that the District failed to provide Samantha with "an adequate and appropriate education" such that Samantha's parents are entitled to reimbursement.  Five Town, 513 F.3d at 284.  The court's conclusion is best summarized by the observation of Dr. Pawletko, who stated:

> Based on my experience with students demonstrating many of the same challenges as Samantha, I would place [Samantha's] level of need at mild to moderate range. There is nothing about her academic needs that could not be well addressed at HMS or most public schools. Her anxiety and difficulty feeling in control of her environment are at moderate levels and require the availability of mental health support and caring staff at school, but this was all available at HMS.  It is my opinion that the staff at HMS is competent and capable of implementing Samantha's IEP and that Samantha's IEP is designed to provide her with educational benefit.

R. at 1101.  The Hearing Officer's conclusion that Samantha was making sufficient academic or emotional progress at HMS will not be disturbed by this court.

---

[34]Certainly, progress was incremental, see, e.g. R. at 1476, 1478-80, but the record supports the Hearing Officer's conclusion that it was "meaningful."  Decision at 9.

3.    **Least restrictive environment**

Finally, the IDEA's statutory preference for placing students in a least restrictive environment, see Roland M., 910 F.2d at 992-93; 20 U.S.C. § 1412(5); 34 C.F.R. § 300.114(a)(2), supports the Hearing Officer's decision that HMS was an appropriate placement for Samantha.  "[T]he correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities.  To determine a particular child's place on this continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement."  Roland M., 910 F.2d at 993 (citations omitted). It has been recognized, therefore, where "reimbursement was sought from school districts for placement other than the public schools, courts have denied the more restrictive alternative in the face of an existent FAPE."  G.D., 930 F.2d at 949.

In this case, HMS provided the least restrictive environment.  Samantha was educated almost exclusively with her non-disabled peers, attending "regular" fifth grade classes, with the exception of one "pull-out" for special instruction in reading.  See Joint Stmt. of Facts ¶¶ 6-7; R. at 1327.  At Learning Skills Academy, however, she attends school exclusively

31

with other learning disabled students.  R. at 1027.  As such, the court concludes that HMS was an appropriate placement for Samantha under the mainstreaming goals set forth in the IDEA. Cf. Lenn, 998 F.2d at 1086 (because the IDEA articulates a preference for mainstreaming, placement in a public school setting is appropriate so long as that placement is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade" (quotations omitted)).

IV.  **CONCLUSION**

The record establishes that Samantha made appropriate educational progress at HMS, where she was mainstreamed with non-learning disabled students.  The court rules, therefore, that Samantha's unilateral placement at Learning Skills Academy was not authorized by the IDEA.[35]  The parties disagree and advance

---

[35]In his order, the Hearing Officer, even though he concluded that HMS provided Samantha with a FAPE, also opined that Learning Skills Academy was "an appropriate placement for Samantha." Decision at 2, 8 (granting parents' proposed finding of fact ¶ 15 and proposed ruling of law ¶ 2).  He further stated that "[t]he evidence reasonably shows that the new private school is more academically appropriate, with less emotional/social demands on Student . . . but the law does not compel this opportunity under the facts presented."  Decision at 10.  The District challenges the Hearing Officer's ruling, contending that:  (1) Learning Skills Academy offered a highly restrictive educational setting, (2) Learning Skills Academy did not implement the IEP agreed upon by the family, and (3) the staff is insufficiently trained. Def.'s Decision Mem. at 20-21.

good-faith arguments over which model is better suited to address Samantha's needs – the HMS "full inclusion" model versus the Learning Skills Academy model featuring small classes comprised of similarly situated peers.  "But, judges are not especially well-equipped to choose between various educational methodologies.  Where, as here, there is satisfactory record support for the appropriateness of the particular approach selected by the school department and approved by the state education agency, a reviewing court should not meddle."  Lenn, 998 F.2d at 1091 n.8 (citations omitted); see Five Town, 513 F.3d at 289 (courts may not reject adequate public placement in favor of optimal private placement).  As such, Samantha's parents are not entitled to reimbursement under the Act.  See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992) (even if placement at Learning Skills Academy provided student with a

---

Having concluded that placement at HMS provided Samantha with a FAPE, the court need not reach the District's arguments. Cf. Five Town, 513 F.3d at 289 (courts may not "reject an adequate public school placement for an optimal private placement").  Nor would it be advisable, in this case, to dissect and critique the Hearing Officer's conclusions regarding the efficacy of a placement at Learning Skills Academy.  Cf. Roland M., 910 F.2d at 992 ("Beyond the broad questions of a student's general capabilities and whether an educational plan identifies and addresses his or her basic needs, courts should be loath to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs.").

better education, if public school education satisfied the
federal standard, reimbursement is not required by the Act); <u>see
generally</u>, <u>Florence Cty.</u>, 510 U.S. at 15; <u>Five Town</u>, 513 F.3d at
289; 20 U.S.C. § 1412(10)(c).

The New Hampshire Department of Education's denial of
reimbursement for the costs of private education is affirmed.
The requests for attorney's fees and for an order granting
prospective placement at Learning Skills Academy are denied.  The
clerk shall enter judgment accordingly and close the case.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Dated:  December 30, 2009

cc:  Theresa Kraft, Esq.
     Melissa A. Hewey, Esq.
     Eric R. Herlan, Esq.
     Melissa Lynn Cilley, Esq.